# UNITED STATE DISTRICT COURT
# FOR THE
# DISTRICT OF NEVADA
# DIVISION

Case No. _3:23-cv-00537_____

Dept No. _____

AMANDA LEE VARON(MCCLELLAND)  )

PLAINTIFF,                    )

VS.                          )

STATE OF NEVADA, DEPARTMENT OF )
PUBLIC HEALTH AND SAFETY,     )
DEPARTMENT OF HEALTH AND      )
HUMAN SERVICES,               )
DCFS (DIVISION OF CHILD AND   )
FAMILY SERVICES)              )
                             )
DEFENDANTS,                   )
_____ )

```
_____ FILED      _____ RECEIVED
_____ ENTERED    _____ SERVED ON
         COUNSEL/PARTIES OF RECORD

         NOV 0 2 2023

      CLERK US DISTRICT COURT
         DISTRICT OF NEVADA

BY: _____ DEPUTY
```

## COMPLAINT

Plaintiff, Amanda Lee Varon (McClelland) in proper person, hereby files this complaint against Defendant, DCFS (Division of Child and Family Services) for monetary damages, DCFS falsifying Court documents; false claims, allegations and testimonies, disability-based discrimination, DCFS falsifying reason (s) in the filed Petition to Terminate the Plaintiff's Parental Rights. Plaintiff endured additional trauma by CPS mishandling this case.

## PARTIES

1. Plaintiff, Amanda Lee Varon (McClelland), (herein after "Plaintiff") is an individual who is currently and was at all times herein a resident of the State of Nevada, County of Carson City, City of Carson City.

2. Defendant, DCFS (Division of Child and Family Services) are a Government Agency who is currently, and was at all relevant times, located in the State of Nevada, County of Carson City, City of Carson City located at 2533 N. Carson Street, Suite 100 Carson City, NV 89706.

## II. FACTS

3. Case opened due to Plaintiff having a mental/nervous breakdown stemming from childhood trauma starting the weekend of Saturday, February 11, 2017. Plaintiff was processing her traumas; of her emotional, mental, and physical abuse with her family from childhood into adulthood.

4. Because of the Plaintiff's mental state at that time, calls made to the DCFS office and Carson City Sherriff's Department, lead the DCFS office cause for concern the safety of the Plaintiff's child.

5. Plaintiff's child was removed from her home, Wednesday, February 15, 2017.

6. Plaintiff was involuntarily placed under a legal 2000 hold at Mallory Triage/BHS (Behavioral Health Services) that caused the Plaintiff further trauma. MOST Team nor the responding Deputies notified Plaintiff where they were taking her. Plaintiff refused to leave until her Uncle, Kevin McClelland, arrived at her residence.

7. DCFS discredited and did not take seriously Plaintiff's claims and allegations against her family, the abuse herself and son received by Rhonda and Kevin McClelland after Plaintiff was released from the hospital, the Plaintiff in outpatient intensive therapy.

8.) Plaintiff's son received continued emotional, mental, and physical abuse while in the care and placement of Rhonda and Kevin McClelland at the discretion of DCFS, Guardian Ad Litem, Kay Ellen Armstrong, CASA, CASA Director, Melanie McCormick and Juvenile Court Judge, Honorable Judge Kimberly Okezie.

9. Plaintiff provided substantiated evidence to back up her claims and allegations for which in turn was used against her as hypervigilance.

10. Plaintiff received continued harassment by the case workers and DCFS Supervisor, Jessica Carstens, adamant on the fact the Plaintiff having a diagnosis she didn't have, disregarding the documents; restraining orders against the Plaintiff's Aunt and Uncle, Rhonda and Kevin McClelland, diagnoses received by her therapist and psychiatrist as well as letters from her therapist stating Plaintiff was not of a safety risk to her child.

11. DCFS and the Juvenile Courts forced a relationship between Plaintiff and her son with McClelland's that was not warranted.

12. Plaintiff remained firm not allowing the McClelland's into her life nor her son's but if DCFS was involved, as stated by DCFS, as were the McClelland's.

## II. FACTS

13. Plaintiff's son was not to be returned home until DCFS and Juvenile Court Judge, Honorable Judge Kimberly Okezie agenda was met with the Plaintiff continuing the relationship between the Plaintiff's son and Rhonda and Kevin McClelland otherwise Carson City District Attorney, Buffy Okuma stated in a Court hearing the Plaintiff not in her right mental state not allowing that relationship to continue, causing the Plaintiff's PTSD symptoms not to subside, wherein DCFS used the Plaintiff's PTSD and anxiety disorder against her, deeming her unfit and incapable caring for her son.

14. Because of the continuance of the relationship being forced between the Plaintiff and the McClelland's, the Plaintiff was not doing well during the in-home plan allowing Kevin McClelland back inside the Plaintiff's life and residence.

15. DCFS had no evidence of the Plaintiff charging her with abuse and neglect.

16. Plaintiff filed a complaint with the Attorney General's office against DCFS, Wednesday, July 03, 2019.

17. Plaintiff filed a complaint with the Department of Health and Human Services Civil Rights Division Friday, July 05, 2019, on behalf of Disability Based Discrimination by the DCFS office and case workers handling this case violating the Plaintiff's Civil Rights.

18. Plaintiff filed a complaint with the Attorney General Constituent Department Thursday, September 14, 2023; Reference ID 47122.

19. Plaintiff has never been hospitalized in her life prior to Wednesday, February 15, 2017.

20. Prior to Wednesday, February 15, 2017, Plaintiff didn't even know what the MOST Team was, until reading the below article upon research after being released from the hospital. https://nevadaappeal.com/news/2016/apr/06/carson-citys-most-program-helps-those-dealing-with/.

21. Plaintiff has never contacted a Sheriff office without legitimate cause or reason.

22. The Plaintiff is not the person who was given as an example in the link above for cause to have been hospitalized, but a sound, upstanding and law-abiding citizen with no criminal record who only had a nervous mental breakdown under severe emotional distress reporting her family to the proper Authorities, her Aunt and Uncle's abuse and neglect of her son. The Plaintiff was scared, knowing what her Aunt, Uncle and their children are capable of.

23. After reading the above article, the Plaintiff was pretty upset with regard to the Carson City Sheriff's Office, Department of Health and Human Services and CPS petitioning the Court placing her under an Involuntary Legal 2000 hold that led for her son to be in the Foster Care System, unable to care for him, because the State hospitalized her based off a false report made by her Uncle to the Carson City Sheriff Office the evening of Monday, February 13, 2017; the Plaintiff's Uncle having reported to the Carson City Sheriff's office her being erratic, basically a danger and safety risk to her son, that was not true.

## II. FACTS

24. Please refer to Police Report/Event # P170440221 from the evening of Monday, February 13, 2017, the Plaintiff's Uncle having gone to the Carson City Sheriff Office after leaving her residence the evening of Monday, February 13, 2017.

25. The Plaintiff's Uncle reported to the Carson City Sheriff Office what he did, after the Plaintiff informed him, she was done with this family, not their time, but her son's.

26. After the Plaintiff said that to her Uncle in Line 25 above, Kevin McClelland left her residence. Kevin McClelland went to the Carson City Sheriff Office reporting what he did to whomever he spoke to in their office that evening.

27. The Plaintiff's Uncle nonetheless came to her residence that evening on Monday, February 13, 2017, unannounced.

28. The Plaintiff's Uncle was aware earlier in the day of Monday, February 13, 2017, prior to his arriving at her residence later that evening on Monday, February 13, 2017, the Plaintiff obtaining restraining orders to file against him and her Aunt.

29. The Plaintiff obtained restraining orders from the Domestic Violence Advocates in the Carson City District Court to file against her Uncle and Aunt; for not only abuse onto herself, but more importantly, her son.

30. The Plaintiff's anxiety was through the roof after obtaining the restraining orders to file against her Aunt and Uncle.

31. The Plaintiff made the mistake of going out to her Aunt and Uncle's residence that day to speak to her Uncle without her Aunt around.

32. The Plaintiff's Uncle attempted to gaslight and bribe the Plaintiff, asking if she would accept a donation for her car. The Plaintiff's Uncle knew the financial hardships she was going through at that time and matters with her son's father, his father not financially helping the Plaintiff with their son.

33. Rather than the Plaintiff filing the restraining orders, she contacted CPS filing a report over the phone the following day on Tuesday, February 14, 2017, reporting abuse of her son and lewd acts performed by her Uncle while her son was laying on her Uncle's stomach/chest back in 2016 while working for the Starbucks Distribution Center in Minden.

34. The Plaintiff contacted the CPS office to retract her report the following morning after waking Wednesday, February 15, 2017, wherein a responding Deputy was sent to her residence by CPS for a wellness check. The Plaintiff decided upon waking that morning of Wednesday, February 15, 2017, not to get the Courts involved or CPS, but to have remained no contact on her own, without getting the Government involved.

4

## II. FACTS

35. After the responding Carson City Deputy, Deputy Israel Loyola arrived for the wellness check, the Plaintiff allowed him within side her apartment, answering the door in a towel, about to get in a shower before he arrived; more Deputies, Molly Blanchette and Jhoanna Presswood arrived from CPS with Bekah Bock from the MOST Team accompanied by Deputy Don Gibson shortly thereafter.

36. The Plaintiff recognized Deputy Don Gibson. The Plaintiff addressed him, saying he looked familiar, her having worked at Jacksons on the graveyard shift off 5th Street.

37. Deputy Don Gibson replied that his evil twin brother, Deputy Mike Gibson.

38. As soon as more Deputies and CPS started to arrive with Bekah Bock from the MOST Team, the Plaintiff's anxiety went through the roof, having placed the Plaintiff under further severe emotional distress.

39. CPS, the other responding Deputies and Bekah Bock from the MOST Team were not invited by the Plaintiff to enter her apartment.

40. The Plaintiff has been filing in the Courts against CPS and the State of Nevada since 2019 because CPS illegally seized her son, placing the Plaintiff under an Involuntary Legal 2000 Hold that led her to be incapable of caring for her son, hospitalized against her will. DCFS terminated the Plaintiff's Parental Rights under false claims and allegations with the petition Sharon Benson, Reno Deputy Attorney General, filed in the District Courts.

41. A CPS case was opened due to the fact the Plaintiff was placed under an Involuntary Legal 2000 Hold. The Plaintiff's son was placed in the Foster Care System, made a ward of the State.

42. CPS, neither the Carson City Sheriff Office, responding Deputies and the MOST Team had a warrant to enter inside the Plaintiff's apartment or a Court order to seize her son, placing him within State Custody, a ward of the State.

43. The Plaintiff allowed the first responding Deputy, Deputy Israel Loyola inside her apartment, because she didn't have anything to hide, knowing she didn't and wasn't doing anything wrong but having been under severe emotional distress reporting her family to the proper Authorities.

44. Because of CPS false claims and allegations, DCFS petition to the Court Termination of the Plaintiff's Parental Rights, DCFS claiming and alleging in the TPR hearing Plaintiff not receiving the proper treatment, the Plaintiff's parental rights were terminated by District Court Judge, Honorable Judge James Todd Russell. Honorable Judge James Todd Russell Terminated the Plaintiff's Parental Rights stating the Plaintiff having mental health issues her entire life.

## II. FACTS

45. The Carson City Sheriff Office and CPS lied in their reports, including but not limited to, what was filed in the Juvenile Court reports by CPS for reasons the Plaintiff's son needing protection, keeping her son in the system, rather than returning her son back to her care as stated by CPS Social Worker, Courtney Welch, six (6) months after her son was removed, CPS returning the Plaintiff's son, but because she refused to allow her Aunt and Uncle back into her son and her lives, CPS continued the matter of this case until the Plaintiff thawed on her decision, same as Juvenile Court Master Judge, Kimberly Okezie. The Plaintiff remained firm not allowing her Aunt and Uncle and their daughters back into her life or her sons with legitimate cause and reason.

46. CPS kept the Plaintiff's son with her Aunt and Uncle who continued their abuse and neglect, while her son was in their care for two (2) years during the matters of this case.

47. The Plaintiff was told by the Public Defender, Katie Felesina Miller, that she would allow her Aunt and Uncle back into her and her son's lives, otherwise the Plaintiff's son would not be returned to her custody. Carson City Public Defender, Katie Felesina Miller informed the Plaintiff, her, and her son victims of Domestic Abuse. When the Plaintiff asked Katie Felesina Miller why she wasn't doing anything to help the return home of her son; Katie Felesina Miller replied because DCFS didn't see it that way.

48. CPS and the Juvenile Court Master Judge, Judge Kimberly Okezie, disregarded what the Plaintiff's therapist sent and stated to herself and CPS, remaining no contact with her family; CPS disregarded therapeutic recommendations by the Plaintiff's therapist at that time, Marci Hinchey, Serenity Mental Health Director, Genevieve Ramos and overseeing Psychiatrist, Dr. Ronald Centric.

49. CPS Supervisor, Jessica Cartsens agreed to the treatment received and diagnosis of PTSD from Serenity Mental Health in CFT Meetings, but contacted the Plaintiff's therapist, Marci Hinchey, searching for and wanting a diagnosis of Bi-Polar that isn't there. Marci Hinchey advised in a therapy session she started to feel the Plaintiff's frustrations, informing DCFS of the diagnosis of PTSD. Marci Hinchey further stated to DCFS the diagnosis not to change. Was shortly after DCFS did not get what they wanted from Serenity Mental Health and the Plaintiff's therapist, DCFS requested the Plaintiff be seen by their Psychologist, Dr. Janet Cahill. DCFS denied the Plaintiff able to obtain her own Psychologist. The Plaintiff underwent a full Psychological Evaluation with Dr. Giron through Carson Tahoe Specialty Unit for three (3) months effective January 2021, ending April 2021.

## II. FACTS

50. CPS Supervisor, Jessica Cartsens, stated in CFT (Child and Family Team) Meetings the Plaintiff receiving the proper treatment, CPS in agreement to the treatment received by Serenity Mental Health and Marci Hinchey but in Court, CPS stated and acclaimed otherwise, as well as in their Court reports to the Juvenile Court and Master Judge, Judge Kimberly Okezie that were filed with and through the Carson City District Court; Judges within side the Carson City District Court adopting into the District Courts, CPS Facts, Finding and Recommendations that were approved by Juvenile Court Master Judge, Honorable Judge Kimberly Okezie. Honorable Judge James E. Wilson and Honorable Judge James Todd Russell were a few Judges from the District Courts who adopted the Facts, Findings and Recommendations into the District Court from the Juvenile Court.

51. Charges were dropped on the Plaintiff for abuse and neglect by the District Attorney, Buffy Okuma in Juvenile Court on the Monday, April 24, 2017, Status Hearing, two months after her son was removed from her care, agreeing to remove charges, over six (6) years ago in the Juvenile courts.

52. A 432.B Case is not substantiated or to have terminated the Plaintiff's Parental Rights, but rather this case to have been more focused on the matters of abuse and neglect from the Plaintiff's family and son's father onto the Plaintiff's son; charges placed onto the offenders with the substantiating evidence provided and medical history due to the abuse .

53. The Plaintiff is not a safety risk to herself, another, most importantly her son.

54. The Plaintiff is a lifelong survivor of domestic abuse stemming from childhood.

55. Plaintiff has Complex PTSD. Having such diagnosis, does not make the Plaintiff incapable of caring for her son, self, or someone else.

56. The matter of events that occurred when all responded to the Plaintiff's residence on Wednesday, February 15, 2017, is not factual or true.

57. The Plaintiff did not belong in a psych ward. The Plaintiff was neither suicidal, nor a safety risk to herself or others.

58. The Plaintiff does not feel the State, Authorities, elected officials, and Government agencies handled this matter appropriately, but invalidated the abuse the Plaintiff and her son endured with his father, Mark Patrick Morey and her Aunt and Uncle that caused further distress and additional trauma onto the Plaintiff.

59. Nevada Medicaid the last two times the Carson City Sheriff Office has hospitalized the Plaintiff in the last two years, Nevada Medicaid denied the hospitalizations and services rendered.

## II. FACTS

60. Nevada Medicaid sent a letter to the Plaintiff and Carson Tahoe Behavioral Health Services, they're not paying for services rendered, stating the Plaintiff did not belong in the hospital, providing their reasons in the letter denying the hospitalization and services. Most recent hospitalization, overseeing Psychiatrist, Dr. Steven Holroyd brought the Plaintiff to Court; the matter was overheard by District Court Judge, Honorable Judge James Todd Russell; Case # 21 MH 00120 1B. Dr. Steven Holroyd, Psychiatrist through Carson Tahoe Behavioral Health Services filed a Petition for an Involuntary Court-Ordered Admission on Tuesday, December 13, 2023. Plaintiff received from the State of Nevada Department of Health and Human Services Division of Health Care Financing and Policy dated Wednesday, December 22, 2021, denial from the date of the request from Saturday, December 18, 2021. The State of Nevada Department of Health and Human Services Division of Health Care Financing and Policy based their decision and reason off the Plaintiff and her medical record. Dr. Steven Holroyd's request did not meet the medical necessity criteria; the patient could be treated with less intensity. Plaintiff filed Wednesday, July 03, 2019, against Dr. Steven Holroyd to Carson Tahoe Health a request to amend protected health information to reflect her proper diagnosis of PTSD; but not to the Plaintiff's surprise, Dr. Steven Holroyd replied Tuesday, August 06, 2019, declining to amend the Plaintiff's medical record, stating the original documentation was reviewed and he determined that it is accurate and complete as is. No amendment would be made.  Thursday, July 18, 2019, Plaintiff received a letter on behalf of and response to her complaint submitted regarding Mallory Triage and Behavioral Health Services from the Department of Health and Human Services Division of Public and Behavioral Health Bureau of Health Care Quality and Compliance. Because of the length of time that had past and employees, they would need to interview who may no longer have been within the hospital, advised their unable to conduct an objective and comprehensive investigation. The full investigation process includes, but is not limited to; medical records review, interviews with the staff which may include doctors, nurses and any ancillary staff who provided care during the stay in the facility. They were not certain that the same staff members would still be employed at the facility after the 12 months. In addition, their investigation requires interviews with a sample of patients who were admitted around the same time frame. For the reasons given, their office closed the complaint, and no further action was taken but they would assess the items related to the Plaintiff's concerns during their next on-site visit to the facility.  Tuesday, August 07, 2019, Plaintiff filed with the Department of Health and Human Services OCR Department via email to OCRComplaint@hhs.gov a complaint on behalf of Carson Tahoe Behavioral Health Services, Mallory Triage and Dr. Steven Holroyd violating her HIPPA Rights. Plaintiff provided to DHHS all related correspondence backing up her claim on behalf of her complaint.

Plaintiff further reported Dr. Steven Holroyd to the Nevada State Board of Medical Examiners. Plaintiff received a response from their office Thursday, September 19, 2019 "No jurisdiction. NRS 630 (the Medical Practice Act) does not cover (provide us with jurisdiction over) the situation you describe, and we cannot identify any agency which might have jurisdiction."

Plaintiff filed a complaint against DCFS with the Department of Health and Human Services OCR Department Wednesday, September 25, 2019, via email to OCRComplaint@hhs.gov; case reference # OCR 19-350391. Plaintiff was then assigned to Steven Chen (Steven.Chen@hhs.gov).

61. The Plaintiff was not informed by the MOST Team or Deputies where they were taking her. MOST and Deputy Don Gibson took the Plaintiff to Mallory, transferred to BHS, where she was held for a week. Was a 72 hour hold initially. The Plaintiff was in the hospital under the Involuntary Legal 2000 hold for a week before she AMA'd herself.

62. Dr. Steven Holroyd, Psychiatrist, through Carson Tahoe BHS (Behavioral Health Services) inpatient under the Involuntary Legal 2000 Hold, told the Plaintiff she followed the program, otherwise the Plaintiff wasn't to be released. The Plaintiff was being treated and diagnosed for something she doesn't have, refusing to take the medication. The Plaintiff does not take medication for something she doesn't have. Neither to be treated for something she doesn't have. The Plaintiff AMA'd herself from the hospital. Dr. Steven Holroyd did not listen to the Plaintiff, neither cared to listen to her, in telling him she did not have Bipolar Disorder or Schizophrenia but continued to treat her otherwise. The Plaintiff was forced to take the medications against her will.

63. Because of the trauma of being hospitalized and the Plaintiff's son being taken by CPS, the Plaintiff had a relapse, entering back into the hospital within a week's time.

64. After release, the Plaintiff obtained the Police Reports from the Civil Records Division of the Carson City Sheriff's Office.

65. The Plaintiff followed through at that time, filing restraining orders against her Aunt and Uncle.

66. The Domestic Violence Advocate, Tammy, after Honorable Judge Steven McMorris asked her input, stated to the Courts that the Plaintiff's Uncle retaliated, having reported what he did to the Carson City Sheriff office. The Plaintiff was unable at that time to include her son on the restraining orders as the Plaintiff initially intended to do in obtaining the orders from the Advocates on Monday, February 13, 2017, because the Plaintiff's son was a ward of the State, in State Custody.

67. Please reference the TPO's filed against the Plaintiff's Aunt and Uncle for your review during; Case No. 17 PO 00162 1C and Case No. 17 PO 00124 1C for Kevin J. McClelland and Case No. 17 PO 00163 1C and 17 PO 00127 1C for Rhonda McClelland. Plaintiff filed a lawsuit against Rhonda and Kevin McClelland, Case #19 0C 00121 1B on Tuesday, July 16, 2019. Plaintiff dismissed her suit because she was informed by the overseeing District Court Judge, Honorable Judge, Judge James Todd Russell, should the Plaintiff proceed and lose, she was responsible to pay for the opposing parties' cost and Attorney fees. Plaintiff at that time, informed the Judge her to dismiss the suit, unable to financially afford the cost and Attorney fees should she have lost.

68. The Plaintiff filed the TPO's against her Aunt and Uncle after she was released from the hospital, having obtained the Police Event/Reports from the Civil Records Division of the Carson City Sheriff Office.

## II. FACTS

69. The Plaintiff has been in and out of Court since the Termination of her Parental Rights with the District and Supreme Court. Reference Supreme Court Case #'s 81690 and 86423

70. Plaintiff has been filing suit against CPS since 2019; Case #'s 19 OC 00126 1B and 22 OC 00072 1B stemming from Juvenile Court Case # 17 JOT 00006 1X.

71. The District Court lacked subject matter jurisdiction; therefore, Plaintiff is taking these matters to the Bruce R. Thompson Federal Courthouse.

72. CPS and all other parties involved in the matter of this case, filed their false claims and allegations to justify their continued removal of the Plaintiff's son from her care and custody, CPS not to take accountability for their mistake, but rather, have continued with their false claims and allegations filing the petition in District Court Termination of her Parental Rights under false pretenses that is perjury and a felony.

73. The Plaintiff is filing this Civil Action against those involved in the matters of this case, the Plaintiff's son removed from her care and her Parental Rights Terminated in 2019 to adopt her son out to family friends of her Aunt and Uncle in California.

74. The Plaintiff's Parental Rights were Terminated under false pretenses, false claims, allegations, reports, and testimonies given by CPS and their Psychologist, Dr. Janet Cahill, in the TPR Hearing; Case # 19 DR1 00422 1B.

75. The Plaintiff has received nothing but continued harassment and maltreatment by the Carson City Sheriff Office Dispatch and responding Deputies since 2017 when this matter started, mistreated, and placed back in the hospital on multiple occasions, where the Plaintiff didn't belong, the Plaintiff not qualifying for their services.

76. The Plaintiff is and has been seeking Justice for the unlawful and wrong injustices and the return home of her son.

## III. CLAIMS FOR RELIEF

A.) Negligence

77. Defendants have a duty to protect children from abuse and neglect.

B.) Other

78. Violation of Plaintiff's Civil and Constitutional Rights

79. Additional trauma

80. Unrepairable damages

## III. PRAYER FOR RELIEF

**WHEREFORE PLAINTIFF PRAYS FOR THE FOLLOWING RELIEF:**

1. For compensatory damages for medical costs and expenses for past, present, and future in excess of $150,000.00.

2. For general damages for past, present, and future pain and suffering and other damages in excess of $150,000.00.

3. Reinstatement of Parental Rights and Return home of Plaintiff's son.

3. For interest at the statutory rate; and

4. For such other and further relief as this court deems just and equitable.

I declare under penalty of perjury under the law of the State of Nevada that the foregoing is true and correct.

DATED this 26th day of October 2023

X _Amanda Varon_
_____
Amanda Varon
Plaintiff

20 W. College Parkway P364
Carson City, NV 89706

**POINTS AND AUTHORITIES**

### I. *Grandparent Rights*

**GRANDPARENT RIGHTS.** Nevada does not explicitly recognize the concept of **Grandparents** visitation **rights.** Under Nevada Law, **a Grandparent's** request for visitation with a Grandchild simply **does** not override the **right** of a child's parent to grant the visitation being requested.

Heidi Miers, Carson City "DCFS" (Division of Child and Family Services) was against my constitutional rights as a parent, my requesting and not allowing visits to continue between Rhonda and Kevin McClelland, furthermore, went behind my back, allowing a visit to occur between Rhonda and Kevin McClelland, on Easter in 2017, my biological sister, Rebecca Cox having brought to my attention, sending me pictures from Rhonda and Kevin McClelland's Facebook account, wherein I was not notified of such visit occurring by Heidi Miers and/or any other social worker within the Carson City "DCFS" (Division of Child and Family Services) office. I had and still have rights, visits not occurring between MJ and the McClelland's.

Under Nevada law, grandparents do not always have the right to visit their grandchildren. However, the court may grant a grandparent a "reasonable right" to visit a child, if a parent of the child:...has relinquished his or her parental rights or his or her parental rights have been terminated. Neither of such was in my case, "DCFS" (Division of Child and Family Services" allowing that relationship and visitation to continue, therefore the Carson City "DCFS" office and the Carson City Juvenile Court Judge, Kimberly Okezie, were, are and have been against my parental rights under the constitution and fourteenth amendment throughout the duration of this case, furthermore, the placement of my child with Rhonda and Kevin McClelland against my wishes, still having had my parental rights, and still do, intact, wherein my son underwent severe emotional, mental, psychological, physical abuse and neglect; to his medical needs while in the placement of Rhonda and Kevin McClelland; the Carson City "DCFS" Division of Child and Family Services and social workers handling the matter of this case, furthermore, the assigned Carson City Juvenile Court Judge, Kimberly Okezie, failure to protect my son, having continued the placement and care of my son with Rhonda and Kevin McClelland, not returning him home where he had/has stability.

### II. Parental Rights

#### A. Due Process Clause of the Fourteenth Amendment

In **Federal Constitutional Law**, the right to **parent** would be considered an unenumerated right, protected from governmental interference by the Due Process of Clauses of the Fifth and Fourteenth Amendments.

Specifically, **parental rights** include: right to physical custody, which means reasonable visitation with a child and regular contact. Right to legal custody, meaning the ability to make major decisions about the child's health, education and religious upbringing.

The Court explained that the **Due Process Clause** of the Fourteenth Amendment protects this liberty, incorporating the "the right to marry, establish a home and bring up children."

### III. *Fundamental Rights*

Fundamental rights are a group or rights that have been recognized by the Supreme Court as requiring a high degree of **protection** from government encroachment. These **rights** are specifically identified in the **Constitution** (especially in the Bill of Rights,) or have been found under Due Process.

### IV. *Americanbar.org*

The U.S. Supreme Court and Federal court rulings highlighted below recognize parents' constitutional rights to the care, custody and control of their children. See Guggenheim's chapter for analysis of these and other cases; as well as an overview of child protection laws and how they affect parental rights.

1
2
3
4
5                              **POINTS AND AUTHORITIES**
6
7
8       *I. Right to Raise Children as Parent Choose*
9
10          ·    **Meyer v. Nebraska** *26 U.S.390*
11
12              (1923) The court held that a statue forbidding the teaching of the German language          impermissibly encroached on
13      the liberty parents possess. The Court explained that the Due          Process Clause of the Fourteenth Amendment protects this
14      liberty, incorporating "the right to
15              marry, establish a home, and bring up children."
16
17          ·    **Pierce v. Soc'y of Sisters**, *268 U.S.*
18              510 (1925), Relying on *Meyer*, the Court struck down an Oregon statue requiring children to
19              attend public schools. This statue interfered with the right of parents to select private or
20              parochial schools for their children and that it lacked a reasonable relation to any purpose
21              within the competency of the state.
22
23      "DCFS" Division of Child and Family Services, CASA and biological son's Attorney, did not allow me the right to raise my child
24      how I saw fit, or Rhonda and Kevin McClelland; Rhonda McClelland, Paternal Great Aunt, and Kevin McClelland, Maternal
25      Great Uncle to MJ, if wanting to get into technicalities their relationship to my son and I, not biologically MJ's grandparents
26      and/or my biological, but adoptive parents, therefore have no right or say to my son, his placement, best interest so on and so
27      forth. Furthermore, no court order granting them grandparent rights, wherein they had a say to my son, his placement etc; other
28      than Kevin McClelland a special interest and party, to this case, adopted into the Master Findings of Fact and Recommendations
29      by Carson City Juvenile Court assigned Judge, Kimberly Okezie.
30
31      The Carson City "DCFS" Division of Child and Family Services office and social workers had no imminent safety risks or
32      dangers within side my home, for which my son unable returning, other than their (DCFS) fixated and adamant on the fact my
33      having Bipolar Disorder, as indicated in their petition termination of my parental rights, left untreated, not receiving the proper
34      treatment. Indicating, alleging and claiming in their reports, as well as Melanie McCormick from CASA, concern to what was
35      being fed to my son during short interval visits, that again, don't and didn't constitute any imminent safety risks or dangers within
36      side my home, to my son's overall mental health, physical well-being, reason not returning him home, but their wanting to see
37      consistency. All are not reasons and/or lawful reasons, keeping a child from their biological mother, and out of the home.
38
39      *II. Right to Make Decisions about Children*
40
41          ·    **Wisconsin v. Yoder**, *406 U.S. 205*
42              (1972) The court held that Wisconsin's compulsory education law violated an Amish Father's
43              rights to take his 15-year-old children out of school to complete their education in Amish ways
44              at home.
45
46          ·    **Troxel v. Granville**, *530 U.S. 57*
47              (2000) The court declared unconstitutional a Washington statue that authorized judges to order
48              parents to permit more visitation between children and their grandparents than the parents
49              desired.
50
51      *III. Foundational cases for applying constitutional protections in child welfare cases*
52
53          ·    **Prince v. Massachusetts**, *321 U.S. 158 (1944)*. The court held states may prosecute parents when they expose their
54              children to serious hazards to their well-being
55
56          ·    **Stanley v. Illinois**, *405 U.S. 465*
57      (1972) The court declared unconstitutional an Illinois dependency statue that deprived unmarried fathers of the care and custody
58      of their children on the custody of their children on the death of the mother without any showing of the father's unfitness.
59
60
61

                                          13

1
2
3
4
5
6                              **POINTS AND AUTHORITIES**
7   *Stanley v. Illinois, 405 U.S. 645 (1972)*
8
9   *Stanley v. Illinois No. 70-5014 Argued October 19, 1971, Decided April 3, 1972 405 U.S. 645*
10
11  Syllabus
12
13  Petitioner, an unwed father whose children, on the mother's death, were declared state wards and placed in guardianship, attacked
14  the Illinois statutory scheme as violative of equal protection. Under that scheme, the children of unmarried fathers, upon the death
15  of the mother, are declared dependents without any hearing on parental fitness and without proof of neglect, though such hearing
16  and proof are required before the State assumes custody of children of married or divorced parents and unmarried mothers. The
17  Illinois Supreme Court, holding that petitioner could properly be separated from his children upon mere proof that he and the
18  dead mother had not been married and that petitioner's fitness as a father was irrelevant, rejected petitioners claim.
19
20  **III. Foundational cases for applying constitutional protections in child welfare cases.**
21
22  Held: 1. Under the Due Process Clause of the Fourteenth Amendment petitioner was entitled to a
23  hearing on his fitness as a parent before his children were taken from him. Pp. 405 U.S. 647-658.
24  (a.) The fact that petitioner can apply for adoption or for custody and control of his children does not bar his attack on the
25  dependency proceeding. P.p 405 U.S. 647-649. (b) The State cannot, consistently with due process requirements, merely presume
26  that unmarried fathers (or mothers) in general, and petitioner, in particular, are unstable and neglectful parents. Parental unfitness
27  must be established on the basis of individualized proof. See Bell v. Burson 402 U.S. 535 Pp. 405 U.S. 649-658. 2. The denial to
28  unwed fathers of the hearing on fitness accorded to all other parents whose custody of their children is challenged by the State
29  constitutes a denial of equal protection of the laws P. 405 U.S. 658. 45 III. 2D 132, 256 N.E. 2d 814, reversed and remanded.
30  White, J., delivered the opinion of the Court, in which Brennan, Stewart, and Marshall, JJ., joined and in Parts I and II of which
31  Douglas J., joined. Burger C.J., filed a dissenting opinion in which Blackmun J., joined post, p. 405 U.S. 659. POWELL and
32  REHNQUIST, JJ., took no part in the consideration or decision of the case. Page 405 U.S. 646
33
34  During my case, the social workers of the Carson City "DCFS" (Division of Child and Family Services) office violated my civil
35  and constitutional rights. The Carson City" DCFS" (Division of Child and Family Services) and Melanie McCormick, CASA,
36  feeling as if because I am an "only" parent unable providing for my son adequately, wanting to see for my son having both a
37  mother and father figure in his life, wherein that is against my constitutional rights as a parent. There is no Law that says a
38  mother and/or father, are unable raising their children on their own, moreover, where if not married etc; that or having a
39  significant other, the child removed from the parent. Such is not different in this case or matter, more so one's opinion (s) what
40  they feel best for my child, when I don't impose a safety risk to my child, "DCFS" (Division of Family Services). having no
41  substantiated evidence my an unfit mother cause and reason termination of my parental rights, other than their feeling my unable
42  providing for my son, the way they see fit, how they feel and see my son should be raised, which again, falls under violation of
43  my constitutional rights as indicated in this document of Proposed Findings of Fact and Conclusions of Law; furthermore placing
44  my diagnose and health matters, as another reason, my not being a fit parent, that falls under ADA laws, disability based
45  discrimination and disability abuse, all as such the Carson City "DCFS" office are and have been in violation of, not only my
46  constitutional but civil rights. Furthermore, placing my son in an adoptive placement nine (9) months before a petition filed and
47  pre-trial termination of my parental rights, wherein in Therapy, his pre-adoptive placement is already being addressed with him,
48  Andi and Shane Meyer, MJ's new parents; Mom and Dad. During Skype visits, MJ confused, such visits between him and I
49  occurring, confusing MJ, MJ knowing who his mother is, but being told otherwise in his current placement and in Therapy,
50  against my son, not only his, but my wishes, as well.  As my therapist, Marci Hinchey indicated, as long as he has food, a roof
51  over his head, basic needs and education, is all he needs; I am able providing. There is no law either indicating that there has to
52  be two (2) parents in order to raise a child. I am more than capable doing on my own. Such of what The Carson City "DCFS"
53  office and CASA wanted and saw fit how to raise my son to their standards, not on their time, deemed me as an unfit parent,
54  unable to do what they expected of me to do, and to their standards and expectations, immediately, though was providing to my
55  son all a child needs, meeting those requirements. Was stated to "DCFS" (Division of Child and Family Services) by Serenity
56  Mental Health, allowing me to go at my own pace. There is no law either that states a parent with a disability, is/are unable
57  having children and/or raising said child on their own. Again, such is against my civil and constitutional rights as a parent,
58  individual and citizen of the United States. In addition to both my son and I, victims of domestic abuse and crime. The mother
59  more especially, is frowned down and looked down upon, because she is seen to have the responsibility protecting her child,
60  wherein the Carson "DCFS" office deemed me "Failure to Protect" when that's all I have been doing, is protecting MJ and I,
61  wherein the Juvenile Court and Carson City "DCFS" (Division of Child and Family Services)  office has made that nearly
62  impossible, wherein in the one responsible for failure to protect, is the Carson City "DCFS" (Division of Child and Family

Services) office having kept my son in an abusive environment, they were made more than well aware of, and substantiated evidence provided of proof.


### *POINTS AND AUTHORITIES*

#### *IV Right to resist coercive state intervention in the family*

- **Duchesne V. Sugarman**, *566 F.2d 817.825 (2d Cir. 1977)*. The second Circuit held " [T]he right of the family remain together without the coercive interference of the awesome power of the state..encompasses the reciprocal rights of both parent and child." The court explained that children have the constitutional right to avoid dislocat[ion] from the emotional attachment that derive from the intimacy of daily association with the parent."

#### *V. Rights of parents to procreate*

- **Skinner V. Oklahoma**, *316 U.S. 535. 536 (1942)*. The Court held an Oklahoma law that allowed the state to sterilize persons "convicted" two or more times for crimes amounting to felonies involving moral turpitude." violated the Equal Protection Clause of the Fourteenth Amendment because it infringed upon the fundamental right to have offspring."
- **Griswold v. Connecticut**. *381.U.S. 479 (1965)* The Court held unconstitutional a Connecticut law that barred the use and distribution of contraceptives even for married persons. Th court ruled the Constitution protects various kinds of intimate privacy and the marriage relationship fell well within a zone of privacy that protected couples from virtually all governmental regulation.
- **Elenstadt V. Baird** *405 U.S. 438 (1972)*. The Court reasoned that because the marital privacy recognized in Griswold protects two independent and distinct individuals, this protection should apply equally, to single person. Accordingly, the Court invalidated a Massachusetts statue that prohibited the distribution of contraceptives to unmarried persons.
- **Roe v. Wade**, *410 U.S. 113 (1973)* declaring for the first time that part of a woman's constitutional right to privacy (including the fundamental right whether or not to beget a child) includes the choice to terminate an unwanted pregnancy (at least in the early stages of the pregnancy). In Roe the Court restricted state power to forbid abortions, holding that a woman's decision whether to bear a child within the sphere of privacy founded in the fourteenth amendment.


#### *VI. Rights of Unfit Parent*

- **Santosky v. Kramer**, *455 U.S. 745 (1982)* The Court declared unconstitutional a New York statue that authorized termination of parental rights based on a preponderance of the evidence. Santosky is the first Supreme Court case to hold that even after parents are found unfit in a contested court proceeding, they retain constitutionally protected parental rights.

Adapted from Guggeneheim, Martin. "Chapter One: General Overview of Child Protection Laws in the United States." In Representing Parents in Child Welfare Cases: Advice and Guidance for Family Defenders. 2015 Copyright ©2015. American Bar Association.

#### *VII. ABA (Americanbar.org)*

**Social Services and Constitutional**
**Rights, a Balancing Act**
**By Benjamin R. Picker and Jonathan C. Dunsmoor**

Imagine the following scenario. You get a call from your spouse to come home immediately because a county social-service worker and police officer are standing outside of your home, demanding to come inside and speak to your three-year-old son. You arrive home a short time later and are told that social services received an anonymous report three days earlier stating that your son is being abused, and they suspect the abuse is by one of his parents. Social Services has since discovered who made the anonymous report but refuses to tell you who the person is because such information is confidential. You deny that any of the abuse has occurred. The Social Worker demands entry into your home to interview and take photos of your son. The social worker also states that your son must reside out of your home with family or friends while the investigation continues. You initially refuse to permit the social worker into your home and you protest the removal of your son from your home. The social worker then states that if you do not cooperate, he will have no choice but to take your child and place him in foster care while the investigation continues. Based on this threat, you reluctantly agree. Your sister could care for your son on a temporary basis. The social worker interviews your child outside of your presence, and your child denies ever being abused. The Social worker takes photographs of your child's body, but sees no-suspicious bruises or injuries. Nonetheless, you are told that your son must stay with your sister for a few weeks, perhaps longer, until the investigation is complete. Furthermore, you are advised that you may not have any contact with your son until the investigation is complete, because you could taint the investigation. In the period that follows, you are never afforded a hearing before a neutral judge, magistrate, or master, and whenever you call social services to obtain the status of the investigation, you are merely told that they are still investigating. After a month being

1  separated from your son, you finally decide that you have had enough and you go to an attorney. You want to know if social
2  services' actions are legal and if your family's rights have been violated.
3
4                                        ***POINTS AND AUTHORITIES***
5
6  **Procedural Due Process under the Fourteenth Amendment**
7  The right to procedural due process is implicated where a constitutionally protected liberty or property is concerned ***Bd. Of***
8  ***Regents of St. Colleges v. Roth, 408 U.S. 564, 570.92 S.Ct. 2701.2705 (1972).*** The crux of procedural due process is the right to
9  notice and an opportunity to be heard at a meaningful time and in a meaningful manner. ***Fuentes v. Shevin, 407 U.S.***
10 ***67.80.92S.Ct.1983, 1994 (1972)***
11 The US Supreme Court has repeatedly held that parents have a fundamental right to make decisions as to the companionship,
12 care, custody and management of their children, which right is protected liberty interest under the due process clause of the
13 Fourteenth Amendment. ***Troxel v. Granville, 530 U.S. 57.65-66. 120 S.Ct 2054. 2060 (2000).*** As a result, there can be no doubt
14 that the Fourteenth Amendment is implicated whenever the government seeks to separate a parent from his or her child, and due
15 process principles generally require the right to notice and a hearing *before* children are separated from their parents. (I was
16 unable given that opportunity, because I incarcerated against my will under an unlawful involuntary legal 2000 hold that led me
17 incapable caring for my son.) ***Hollingsworth v. Hill. 110.F.3d 733.739(10th Cir. 1997).*** The separation does not have to be
18 carried out with force for due process to be implicated; instead, duress or coercion will be sufficient, such as where a social
19 services worker threatens to place the children in foster care if the children are not "voluntarily" placed outside of the home with
20 family or friends.
21 ***Croft v. Westmoreland County Children & Youth Servs., 103 F.3d 1123, 1125 (3d. Cir. 1997): Dupuy v. Samuels, 462 F. Supp***
22 ***2d 859 (N.D. Ill. 2005). aff'd 465 F. 3d 757 (7th Cir. 2006).***
23 However, where there is reasonable suspicion to believe that a child is in "imminent danger" of serious harm, a per-deprivation
24 hearing is not required. ***Hollingsworth. 110 F.3d at 739.*** In such a case, several courts have determined that a post-deprivation
25 hearing must be afforded within 72 hours, even if such a hearing has not been requested by the family. ***Patterson v. Armstrong***
26 ***County Children and Youth Servs. 141 F. Supp.2d. 512.531-39 (W.D. Pa. 2001).***
27 Some courts have permitted slightly longer or required slightly shorter periods depending on the circumstances. ***Berman v.***
28 ***Young 291 F3d976, 985 (7th Cir. 2002)*** concluding that 72-day delay was 'rather outrageous' but finding no damages): ***Jordan v.***
29 ***Jackson 15 F. 3d 333.351 (4th Cir. 1994)*** (concluding that 65-hour delay was constitutionally permissible but was "near. If not
30 *at. The outer limit of permissible delay").*
31 ***Lossman v. Pekarske, 707 F. 2d 288.290 (7th Cir. 1983)*** (approving a 12-day delay, but nothing that hearing would have
32 *occurred earlier if parents did not request additional time to prepare).* In any event., where a child is seized based on the
33 existence of imminent danger, due process is not negated. It is merely delayed. ***Suboh v. D.A.'s Off. Of Suffolk. 298 F3d 81.92***
34 ***(1st Cir. 2002).***and the maximum permissible delay in providing a post-deprivation hearing "should ordinarily be measured in
35 hours and days, as opposed to weeks." ***Brown v. Daniels. 128. Fed. Appx. 910. 915 (3d. Cir. 2005)*** (unpublished).
36 In the scenario above, there has likely been a violation of the parents' procedural due-process rights. The child was coercively
37 removed without a per-deprivation hearing despite the fact that there was no evidence that the child was in any imminent danger,
38 which is doubtful given the three-day delay between the anonymous report and the removal of the child, the child was separated
39 from the child's parents for a month without the family being afforded a state-initiated post-deprivation hearing. Such facts could
40 provide ample grounds for bringing a civil rights action under *42 U.S.C. §1983.*
41 **Seizure under the Fourth Amendment**
42 The Fourth Amendment guarantees individuals the fundamental right "to be secure in their persons…against unreasonable
43 searches and seizures..." by government officials. Several courts have held that the removal of children from their home is a
44 seizure implicating the Fourth Amendment.
45 ***Kocavic v. Cuyahoga County Dept. of Children and Fam.809 F. Supp.2d754, 771-75 (N.D. Oh. 2011).*** rev'd in part and aff'd in
46 part, ***606 F.3d 301 (6th Cir. 2010): Silliven v. Indiana Dept. of Child Servs. 635 F.36 921 (11th Cir. 2011): Hernandez v. Foster.***
47 ***657 F3d 463 (7th Cir. 2011): O'Donnell v. Brown. 335 F. Supp. 2D. 787 (W.D. Mich. 2004): Gedrich v. Fairfax County Dept.***
48 ***of Fam. Servs. 282 Fsupp. 2D 439 (E.D. Va. 2003): Doe v. Heck. 327 F.3d 492 (7th Cir. 2003): Yuan v. Rivera. 48. F. Supp.2d***
49 ***335 (S.D.N.Y.1999).***
50 Ordinarily, to comport with the Fourth Amendment, consent, a warrant, or a court order, or probable cause to believe that serious
51 abuse is occurring, is required before a child may be seized by social services. Id, However some courts have applied the "special
52 needs" doctrine in child-abuse investigations, pursuant to *which children may be placed in protective custody based on a lesser*
53 *standard of reasonableness.* ***Doe v. Bagan. 41 F. 3d 571. 575. n. 3. (10th Cir. 1994): Wildauer v. Frederick County.993. F.2d***
54 ***369, 372-73 (4th Cir. 1993).*** In any event, an exception to the probable-cause requirement exists where there are exigent
55 circumstances, which refers to situations where "real, immediate and serious consequences would certainly occur were a police
56 officer or social worker) to postpone action to get a warrant." ***Kocavic, 809 F. Supp 2d at 774.*** Some courts have treated the
57 concept of "imminent danger" under the Fourth Amendment identically to the concept of "exigent circumstances" under the
58 Fourth Amendment. ***Good v. Dauphin County Social Servs. For Children and Youth, 891 F. 2d 1087, 1093-94 (3d. Cir. 1989.)***
59
60
61
62

1
2
3
4                                           ***POINTS AND AUTHORITIES***
5
6     In our scenario above, a court might find that the seizure of the child violated the Fourth Amendment because the social worker
7     did not have a court order or warrant, and there may not have been any exigent circumstances, especially given the three-day
8     delay between receiving the anonymous complaint and acting upon it. (In my case there was no court order for seizure, nor was
9     one ever provided to me, not told where I was going, i.e. Deputy Don Gibson and Bekka Bok from the MOST Team associated
10    with the Carson City Sheriff's Department taking me to Mallory Triage, furthermore, no court order provided to me, indicating
11    such a 72 hour involuntary hold, that or a search warrant present or given to me by responding, Deputy Loyola, who I willing
12    allowed coming inside my residence, because I had nothing to hide, knowing I wasn't doing anything wrong.
13
14    ***First Amendment Right to Familial Association***
15
16    The First Amendment also provides a possible cause of action. Courts have recognized that the First Amendment protects the
17    fundamental right to intimate association, which includes the familial association between parents and children. ***Doe v. Fayette***
18    ***County Children and Youth Servs. Bi, 8-823, 2010 WL. 4854070 . "18-19 (W.D.) Pa. Nov 22, 2010): Behm v. Luzerne County***
19    ***Children and Youth.172 F. Supp. 2d. 575.585 (M.D. Pa. 2001).***
20
21    Where government action substantially interferes with fundamental rights, such as the right to family relationships, it is subject to
22    strict scrutiny, which means that the government must have compelling reason for its action and its means to achieve its goal
23    must be narrowly tailored as possible. ***Id.*** Although the government certainly has a compelling interest in protecting children who
24    are in danger, the seizure of a child from his or her parents, or the banning of all communication between them, is not always the
25    most narrowly tailored means to achieve its goal. ***Id.***
26
27    In our fact, pattern above, unless social services had a reason to believe that the child was in danger, it did not have a compelling
28    reason to separate the child from his parents. Moreover, unless separation was the most narrowly tailored means of achieving its
29    goal of protecting the child from abuse, the First Amendment may have been violated.
30
31    ***Substantive Due Process under the Fourteenth Amendment***
32    Outside of thhe child-seizure context, substantive due process can also be used as a sort of "catchall" for constitutional violations,
33    and it applies when the actions of a government official are so "egregious, so outrageous, that it may fairly be said to shock the
34    contemporary conscience." ***Robert v. Mentzer. No. 09-3251. 2010 WI.2113405 at *4 (3d Cir. May 27, 2010).*** Whether conduct
35    "shocks the conscience" depends on the particular facts of the case and the period of time in which the child-welfare worker had
36    to contemplate his or her actions. ***Doe v. Fayette County Children and Youth Servs. 2010 WL 4854070 at *9-18.*** One example of
37    conscience-shocking behavior is where child-welfare workers remove children from their home and falsely advise the children
38    that their mother had abandoned them. ***Behm. 172 F. Supp. 2D at 585-85.*** Some courts hold that substantive due process may not
39    be called upon when a specific constitutional provision (such as the First and Fourth Amendment) protects the right allegedly
40    infringed upon ***Hernandez ex rel. Hernandez v. Foster, 657 F. 3d 463.474 (7th Cir. 2011).*** Nonetheless, there appears to be an
41    independent right to familial integrity under the Fourteenth Amendment which is limited by the compelling governmental interest
42    in the protection of children, particularly where the children need to be protected from their own parents. ***Evans ex re. Evans v.***
43    ***Richardson No. 08-C-5593, 2010, WL, 1194272 at *5- (N.D. III. Mar 19, 2010).(Citing, Croft 103, F.3d at 1125-26).*** However,
44    a state has no interest in protecting children from their parents unless it has some definite and articulable evidence giving rise to a
45    reasonable suspicion that a child has been abused or is in imminent danger of abuse. ***Id.***
46    Therefore, if a child is separated from his or her parents based on insufficient evidence, the family's right to familial integrity
47    and, therefore, the right to substantive due process under the Fourteenth Amendment, will have been violated. It appears from the
48    fact pattern that the report of abuse was anonymous and that the child-welfare workers may not have had any other evidence of
49    abuse. Given the fact that "an anonymous tip may justify investigation but will not provide reasonable grounds for removal of a
50    family member absent independent, articulable criteria of reliability." ***Croft, 103 F.3d at 1126***, it appears that the parents' and
51    child's rights under the Fourteenth Amendment right to family integrity were violated.
52
53    ***Conclusion***
54    While child-welfare workers have the important but difficult job of ensuring the safety of children, they nonetheless must act in
55    accordance with constitutional principles. Child-Welfare workers, and the agencies they work for, cannot and should not interfere
56    with the fundamental constitutional right to familial relations and integrity, the right to make decisions as to the companionship,
57    care custody and management of one's children, or the right to be free from illegal seizure. Without being subjected to a civil-
58    rights action. Although its nearly impossible to train social service workers for every possible fact pattern and contingency, in the
59    authors' opinion, providing child-welfare workers with exhaustive and detailed training is the best way to avoid the substantial
60    harm that can arise from the improper interference with a family.
61
62    **Keywords:** civil rights litigation due process. First Amendment, seizure. Fourth Amendment, Fourteenth Amendment.

Copyright © 2018 American Bar Association.

## POINTS AND AUTHORITIES

### VIII. *Justice.gov*

*Federal Domestic Violence Laws*

*Issues and Answers*

Violence and abuse at the hands of a loved one is frightening, degrading and confusing. Have you experienced this violence and abuse? If so, you are a victim of domestic violence. You are also the victim of crime.

In 1994, Congress passed the **Violence Against Woman Act ("VAWA").** This act, and the 1996 additions to the Act, recognize that domestic violence is a national crime and that federal laws can help an overburdened state and local criminal justice system. In 1994 and 1996, congress also passed changes to the *Gun Control Act* making it a federal crime in certain situations for domestic violence abusers to possess guns. The majority of domestic violence cases will continue to be handled by your state and local authorities. In some cases, however, th;e federal laws and the benefits gained from applying these laws, may be the most appropriate course of action.

**What are the Federal Crimes?**

All the federal domestic violence crimes are felonies.

It is a federal crime under the *Violence Against Women Act ("VAWA")*:
It is a federal crime under the *Gun Control Act: (Mark Patrick Morey Sr. is in violation to)*
·      to possess a fire arm and/or ammunition while subject to a qualifying protection Order; and
·      to possess a firearm and/or ammunition after conviction of a qualifying misdemeanor crime of domestic violence.
In a **VAWA** case, the court must order restitution to pay the victim the full amount of loss. These losses include costs for medical or psychological care, physical therapy, transportation, temporary housing, child care expenses, loss of income, attorney fees, costs incurred in obtaining a civil protection order, and any other losses suffered by the victim s a result of the offense.

In a **Gun Control Act** case, the Court may order restitution. Please keep a record of all expenses caused by the domestic violence crime.

*What is a qualifying Domestic Violence Misdemeanor?*

Possession of a firearm and/or ammunition after conviction of a "qualifying" domestic violence misdemeanor is a federal crime under Section 922 (g) (9). Generally, the misdemeanor will "qualify" if the conviction was for a crime committed by an intimate partner, parent or guardian of the victim that required use of the attempted use of physical force or the threatened use of a deadly weapon. The United States Attorney's office will examine your case and determine whether the prior domestic violence misdemeanor conviction qualifies according to the law.

*Who is an Intimate Partner?*

Generally, the federal law recognizes an intimate partner as a spouse, a former spouse, a person who shares a child in common with the victim, or a person who cohabits or has cohabited with the victim. A victim in a VAWA case shall have the right to speak to the Judge at a bail hearing to inform the Judge of any danger posed by the release of the defendant. Any victim of crime of violence shall also have the right to address the Court in person, at the time of the sentencing.

**Victim's Rights**
A federal domestic violence victim has the following rights under 42 U.S.C. Section 10606 (b):
1) The right to be treated with fairness and with respect for the victim's dignity and privacy;
2) The right to reasonable protection from the accused offender;
3) The right to be notified of court proceedings;
4) The right to be present at all public court proceedings related to the offense, unless the court determines that testimony by the victim would be materially affected if the victim heard other testimony at the trial;
5) The right to confer with the attorney for the Government in the case;
6) The right to restitution;
7) The right to information about the conviction, sentencing, imprisonment, and release of the offender.

Please refer to in Exhibits Notre Dame Journal of Law, Ethics and Public Policy Volume 31, Issue 2 2017 Failure to Protect: Our Civil System's Chronic Punishment of Victims of Domestic Violence.

### *POINTS AND AUTHORITIES*

#### IX. NCD. GOV
##### National Council on Disability

#### Chapter 16: Need for Legislation to Ensure the Rights of Parents with Disabilities and Their Families
With respect to fundamental liberty, the U.S. Constitution limits a state's right to interfere with a person's most basic decisions about family and parenthood. [1294] And yet, 37 states have child welfare laws [1295] and nearly every state has child custody and guardianship laws [1296] that invidiously classify parents with disabilities and authorize removal and detention of their children or termination of their custody or parenting rights on the basis of the parent's disability. This situation creates an atmosphere of doubt for the disability community and is not ethically or legally tenable, in the words of the Supreme Court Justice John Paul Stevens, "Liberty finds no refuge in a jurisprudence of doubt." [1297] These laws serve no purpose and have no effect other than to lessen the status and human dignity of parents and prospective parents with disabilities in the United States, and to officially classify their relationships with their children as inferior to those of other parents. After nearly 25 years of state court decisions involving these discriminatory laws and the policies and practices they engender, it is clear that existing federal regulations (the Bill of Rights, [1298] the Rehabilitation Act of 1973 [1299] the Americans with Disabilities Act [1300] and the Code of Federal Regulations [1301] are not adequate to ensure the rights of parents with disabilities and their children.

#### History of Efforts to Challenge or Defeat Laws Harmful to Parents with Disabilities
The strongest law and argument to protect this population of families should be found in child welfare cases, where the Constitution is so strongly implicated. Yet even in child welfare jurisprudence, no successful anti discrimination strategy have emerged.

#### Due Process
Parent litigants have unsuccessfully raised the due process clause of the 14th Amendment in both on-the-face and as-applied challenges to discriminatory laws and related policies [1302] Parenting a fundamental right, and legislation that affects this right is subject to strict scrutiny on judicial review [1303] Theoretically, this interest is defeasible only by a compelling state interest and a rigorous procedural process [1304] However some state laws allow child welfare systems and courts to deny reunification services-the key procedural safeguard to retaining parenting rights in child welfare cases-even to non-offending parents on the basis of the parent's disability [1305] Often this dis-allowance is based solely on speculation that parental disability *may, keyword; MAY "HYPOTHETICAL"* be detrimental to a child at some point in the future. There is a contradiction between the treatment of parents with disabilities and that of parents without disabilities: In child welfare cases generally, such speculation is unacceptable, however in cases that involve parents with disabilities, speculation is acceptable. At least one circuit has held that due process is violated and social workers can lose their immunity to lawsuit if they remove a child while consciously disregarding the "great risk that there has been no abuse." [1306] (Abuse and Neglect charges were dropped on me at the beginning of this case.)

Some courts have avoided addressing this holding that strict scrutiny does not apply on judicial review of the laws authorizing this policy holding that strict scrutiny does not apply on judicial review of the laws authorizing the policy, because there is no fundamental right to reunification services, despite their centrality to avoiding loss of fundamental right [1307] This reasoning is equivalent to saying that if an African American Citizen is allowed to vote but prevented by law from entering a voting booth, no violation of a fundamental right has occurred and strict scrutiny should not be applied during judicial review of the legislation. Other courts have held that a rigorous procedural process is in place to protect parents with disabilities, because in their state, the law disenfranchises parents with disabilities from participating in reunification services only after two psychologists have established that they are unlikely to benefit from such services [1308] This is equivalent to saying that if an African American is allowed to vote but kept by law from voting unless he or she can pass a literacy test, no violation of fundamental right has occurred, and strict scrutiny is satisfied because a process is in place. The Voting Rights Act of 1965 [1309] explicitly forbade such procedural obstructionism in voting policy; it should not be tolerated in child custody or child welfare policy.

#### Equal Protection
Parent litigants have been similarly unsuccessful in using the equal right protection clause of the 14th Amendment as a defense against discriminatory state laws, *City of Cleburne v. Cleburne Living Center [1310]* established that disability is not suspect classification and, in theory, a simple rationality test is the only hurdle a state is required to clear. [1311] However, although the Cleburne court said "rational", the analysis applied in the decision is widely recognized to represent something more akin to heightened scrutiny ("active rationality" or rationality with bite.") [1312] There was hope that after passage of the ADA, this intermediate scrutiny would be formally recognized as the proper level of judicial review in disability cases because of the congressional direction it represents-a direction the Cleburne court complained that it lacked. [1313] This has no occurred, and no court to date has struck down on the basis of irrationality any child custody or child welfare law alleged to discriminate against

parents with disabilities. This despite the fact that the laws cannot be proved to be substantially related to the objective of promoting child welfare as there is no evidence that child maltreatment is more prevalent among parents with disabilities. [1314]

## POINTS AND AUTHORITIES

### Rehabilitation Act and Americans with Disabilities Act

Parents litigants have achieved only slightly more success in raising the Rehabilitation Act, or the ADA as a defense against discriminatory laws. Pursuant to both laws, state actors, including child welfare agencies and courts, may not discriminate against people with disabilities; rather, they must accommodate them and provide, where needed more, different, or adapted services and programs to satisfy the requirements of the law. [1315] State legislatures, child welfare system, and juvenile, family, and probate courts have resisted the implications of both acts for child welfare or custody statues. This resistance persists despite the established legal principal that a state statue is void it contravenes any express provision of a valid federal statue, even in areas traditionally within the purview of the state, where the congressional intent is clear. [1316] Not one court has voided one of those laws for violation

of the ADA on the basis that it discriminates against parents with disabilities or their children (who are theoretically protected from discrimination by association by both the ADA and Rehabilitation Act). [1317] It is almost uniformly accepted that violation of the ADA is not a defense to termination of parental rights [1318] and few courts have found services unreasonable for failure to provide accommodations. [1319] Parents with disabilities cannot win these cases without legislation specific to them. Two possible avenues exist for creating such legislation: federal legislation in the form of an amendment to the ADA or a stand-alone federal law, or a concerted and organized national campaign to uniformity introduce a model-based state law in each state. Both approaches have strengths and weaknesses.

### State Legislation

This type of legislation is clearly addressable at the state level, as shown in Idaho, Kansas and California. The state law approach avoids constitutional complications in that family and domestic law is historically within the purview of the states. The drawback of state-by-state legislative efforts is the enormity of the undertaking, the complexity of organizing on so many fronts, and the risk that a significant number of the efforts will fail and the patchwork quilt of laws will remain.

### Federal Legislation

The federal law approach, whether as an amendment to the ADA or a stand-alone piece of legislation, avoids the drawbacks of state legislative efforts. It would provide national uniformity and therefore, predictability complexity exists: Opponents would likely argue that the commerce clause does not support federal intrusion into traditional state subject matter. The spending clause-in which the Adoptions and Safe Families Act is grounded-is a better possibility, but it would require funding that is unlikely in the current economic climate. However, Section 5 of the 14th Amendment does empower Congress to "to enforce, by appropriate legislation" the provisions of the 14th Amendment. [1320] The two-part Section 5 review framework enunciated by the Court in Tennessee v. Lane/1321] both synthesized and modified elements of the analysis developed in six previous Supreme Court cases. [1322] Former Supreme Court clerk, Kevin Schwartz, in his Yale Law Review Article "Applying Section 5: Judicial Conditions on the Congressional Enforcement Power," referred to this analysis as a "juricentric enforcement model" Schwartz wrote, "The court asks, first whether Congress's [Section]...5 power is appropriately invoked, and, second, whether the actual Section 5 law crafted by Congress is an appropriate remedy." [1323] To satisfy the first prong, there must be a history or pattern of state violations of the fundamental liberty Congress is seeking to protect. [1324] Second, the violations must be unconstitutional according to previous Section 5 decision by the Court. [1325] To satisfy the second prong, the legislation must create a "congruent and proportional" response to the violations. [1326] The model legislation could satisfy both prongs. Regarding the first prong (constitutional violation offensive to the court), parenting is a judicially identified fundamental liberty with a robust Supreme Court jurisprudence to support the requirements of due process where the state

is interfering in the family sphere. Numerous state statues deprive parents with disabilities of due process on the basis of their classification as disabled. A historic record exists of violations in the form of congressional testimony regarding the need for passage of the ADA, current data documenting disparate impact in the child welfare systems, and extensive anecdotal evidence from individuals aggrieved by disability discrimination in child welfare and child custody proceedings. All these forms of "evidence" support finding a pattern of state violation under the Lane analysis. [1327]

### IX. NCD. GOV
#### National Council on Disability
#### Chapter 16: Need for Legislation to Ensure the Rights of Parents with Disabilities and Their Families

Regarding the second prong (congruent remedy) the model legislation is certainly no more far-reaching that Title II of the ADA, which was upheld as applied in Lane. The court noted in that case that "within the limits of practicability, a state must afford to all individuals a meaningful opportunity to be heard in its courts," [1328] and endorsed Congress's remedial conclusion that "failure to accommodate people with disabilities, often has the same practical effect as outright exclusion.

**POINTS AND AUTHORITIES**

**Conclusion**

Whether action is taken at the state or federal level, as an amendment or a new law altogether- the need for action could not be more timely or clear.

Recently, the media have reported that some survivors of the eugenics era are seeking justice for the state's denying them the possibility of having children, and the public has been outraged on their behalf. But what will it take for our society to become outraged and act to prevent the removal of existing children from parents with disabilities? People must be helped to see that, in the disability community, prevention of procreation and removal of children are two sides of the same coin, tossed in time from generation to the next.

NCD recommends that Congress enact legislation similar to ICWA, in accordance with language set for in Appendix C of this report, to ensure the rights of parents with Disabilities and their children. Alternatively, a legislative amendment to the ADA (in accordance with the language set forth in Appendix D) and other relevant federal acts governing child welfare, child custody, adoption, and assisted reproductive technologies will be necessary to effect the intention of the ADA at the national level. Moreover, states are urged to immediately amend state statues with the language set forth in Appendix C.

*X. Constitution of United States of America 1789 (rev. 1992)*

**I. Amendment V**
No person shall be held to answer for a capital, or otherwise infamous crime, unless a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service time of War or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property, without due process of law; nor shall private property be taken for public use, without just compensation.

**II. 14th Amendment**
Fourteenth Amendment, amendment (1868) to the Constitution of the United States that granted citizenship equal and civil legal rights to African Americans and Slaves who had been emancipated after the American Civil War, including them under an umbrella phrase "all persons born or naturalized in the United States….

**III. Amendment XIV**
**Section 1**
All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens in the United States; nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of laws.

- President Donald Trump signed into law, 2018, the Bipartisan Budget **Act** of 2018 and the Family First Prevention Services Act which is working to bolster families and keep children safely in their homes, when possible. "We must strive to keep families united, wherever possible, and my Administration is working to reduce the removal of at-risk children from their homes and familiar surroundings," Trump stated in his proclamation on National Foster Care Month in April 2019. The Family First Prevention Services Act was signed into law as part of Bipartisan Budget Act on February 09, 2018. This act reforms the federal child welfare financing streams, Title IV-E and Title IV-B of the Social Security Act, to provide services to families who are at risk of entering the child welfare system. **The Family First Prevention Services Act** also seeks to curtail the use of congregate group care for children and instead places a new emphasis on **family** foster homes.
- THE SUPREME COURT RULED THAT THERE IS A PRESUMPTION THAT A PARENT ACTS IN THEIR CHILDREN'S BEST INTERESTS NOT CHILD PROTECTION SERVICES (CPS) OR YOUR STATE. The United States Supreme Court has stated: "There is presumption that parents acts in their children's best interests, ***Parham v. J.R., 442 U.S. 584 602;*** there is normally no reason or compelling interest for the State to inject itself into the private realm of the family to further question a parents' ability to make the best decisions regarding their children. ***Reno v. Flores, 507 U.S. 292, 304.*** The State may not interfere in child rearing decisions when a parent is available. ***Troxel v. Granville, 530 U.S. 57 (2000).***

1
2
3
4        **POINTS AND AUTHORITIES**
5
6
7
8        ***CONCLUSION:***
9
10   Because I am a victim/survivor of domestic abuse and crime, undergone domestic abuse, does not make me an
11   unfit parent. Should I have kept the relationship (s) of domestic abuse, allowing them to continue, I can see
12   where I would be deemed an unfit parent, though such relationship (s) have severed. Moreover, the fact I have
13   "PTSD" stemming from childhood trauma abuse and neglect, is not a reason to keep a biological child from
14   their mother, in addition to "CASA" hypothesizing such circumstances; should my anxiety derail, not to be of
15   an occurrence, reason not having returned my son home sooner than he was in January of 2019. Carson City
16   "DCFS" Division of Child and Family Services, Carson City District Attorney office and Carson City Juvenile
17   Court Judge, Kimberly Okezie, have had no substantiated evidence removal of my son based off of abuse and
18   neglect on my part wherein a 432.B case to be legitimate, basis and cause for continued removal from my care
19   and custody, furthermore, no evidence of abuse and neglect done by myself onto my biological son, wherein
20   the charges of abuse and neglect were dropped on myself, by Carson City, District Attorney, Buffy Okuma,
21   toward the beginning of this case in the Carson City Juvenile Courts, but then geared on my mental health,
22   wherein we are not in mental health court, or have given any reason to be assigned to mental health court, but
23   matters pertaining to abuse and neglect. A parent, such as myself, having "PTSD"; anxiety and depression
24   from Childhood trauma abuse and neglect, does not leave me incapable, unable and/or an unfit mother to my
25   son or impose a safety risk, as stated by my therapist, Marci Hinchey, to all involved in this case, at the
26   beginning; moreover, I do not represent, or ever will represent, a safety risk to my child, but a safe haven, his
27   biological mother, and protector. The problem with this finding and petition, is that the findings are nonfactual,
28   holding no validity, and inadmissible based off several other medical professionals, reports and evaluations
29   that supersede DCFS petition to terminate parental rights, their psychological evaluation performed by their
30   own psychologist, Dr. Janet Cahill diagnosing me as and with Bipolar, based off compiled reports, in addition
31   to Behavioral Health Services, not knowing or taking the time getting to know me with my past history, in
32   order to properly diagnose me; wherein other collateral, medical professionals, evaluations and intakes, show
33   and reflect Amanda Lee McClelland no other than, and more than capable, a fit parent to her son. The court
34   should reject the petition terminating parental rights as to Amanda Lee McClelland, as what is and has been
35   stated in the petition reasons requesting said rights terminated, hold no validity, nonfactual and unjustifiable
36   reasons for termination, more so in the Master's Fact Finding and Recommendations that have and had been
37   adopted into the courts, based off DCFS reports, that do not impose, held or hold a safety risk to her biological
38   son during the duration of this case, neither falling under the lines of abuse or neglect either, basis of this
39   "case" being a 432.B case, reason appellant son, is in, and a ward of the State, and Custody of Nevada. This
40   defendant has shown and proven over the course of the last three years, her more than capable, and a fit parent
41   to her son, over and beyond, that should be recognized, especially given the exigent circumstances, working
42   through her past traumas, not of an easy task to do, in the midst of raising a little one, among other
43   circumstances that arose due to this case, but prevailed, not having gotten herself in any form or kind of
44   trouble, has no criminal record and a law abiding citizen, who is more than deserving having her biological son
45   back in her care and custody, full time when financially able supporting her son. Kept her housing over the
46   last three (3) years wherein able and still able and will continue to be able providing a home for her son.
47   Amanda McClelland has shown nothing other than progress throughout the duration of this case, with a few
48   minor setbacks, that are a given, with the circumstances.
49
50   RESPECTFULLY SUBMITTED this 26th day of October 2023.
51                                                              By:_____
52                                                              Amanda Lee Varon (McClelland)
53                                                              20 W. College Parkway P364
54                                                              Carson City, NV 89706

1

2 **<u>CERTIFICATE OF SERVICE</u>**

3 I, Amanda Lee Varon (McClelland) hereby have provided the foregoing to serve onto the following via

4 U.S. Mail, Email transmission and to the Carson City Sheriff Office Thursday, October 26, 2023.

5

6 **Bruce R. Thompson Federal Courthouse**           **DCFS C/O**

7 400 S. Virginia Street                             Attn: Cindy Pitlock, DCFS Head Administrator

8 Reno, NV 89501                                     2533 N. Carson Street, Suite 100

9                                                    Carson City, NV 89706

10

11 **DCFS C/O**                                       **DCFS C/O**

12 Attn: Jessica Cartsens, DCFS Supervisor II         Attn: Shelby Riley, Social Worker I

13 2533 N. Carson Street, Suite 100                   2533 N. Carson Street, Suite 100

14 Carson City, NV 89706                              Carson City, NV 89706

15 jcartsens@dcfs.nv.gov                              shelby.riley@dcfs.nv.gov

16

17 **DCFS C/O**                                       **DCFS C/O**

18 Attn: Jhoanna Presswood, Social Worker III         Attn: Mickayla Porter, Social Worker I

19 2533 N. Carson Street, Suite 100                   2533 N. Carson Street, Suite 100

20 Carson City, NV 89706                              Carson City, NV 89706

21 jpresswood@dcfs.nv.gov                             (4460 S. Highland Drive, Suite 210

22                                                     Salt Lake City, UT 84124)

23

24 **DCFS C/O**                                       **DCFS C/O**

25 Attn: Molly Blanchette, Social Services Manager III  Carson City District Attorney Office

26 2533 N. Carson Street, Suite 100                   **Attn:Buffy Okuma Carson District Attorney**

27 Carson City, NV 89706                              885 E. Musser Street Suite 2030

28 mblanchette@dcfs.nv.gov                            Carson City, NV 89701

29                                                    BOkuma@carson.org

**DCFS C/O**

Attn: Dr. Janet Cahill, DCFS Psychologist

2533 N. Carson Street, Suite 100

Carson City, NV 89706

jcahill@childfamilymh.com

**DCFS C/O**

Attn: Jennifer Jonte, Adoption Worker

BSW, Social Worker III

1735 Kaiser Street

Fallon, NV 89406

jjonte@dcfs.nv.gov

**Carson City Sheriff Office**

Attn: Deputy Don Gibson

911 E. Musser Street

Carson City, NV 89701

**Reno Attorney General**

Attn: Stephen J. Avillo

5420 Kietzke Lane, Suite 202

Reno, NV 89511

savillo@ag.nv.gov

**Kay Ellen Armstrong**

209 N. Pratt Avenue

Carson City, NV 89701

Lapswimmer1956@gmail.com

**CASA C/O DCFS**

Attn: Melanie "Emmy" McCormick, CASA Director

1539 E. Fifth Street

Carson City, NV 89701

MelanieMcCormickCASA@outlook.com

**Carson City Sheriff Office**

Attn: Bekah Bok, MOST Team

911 E. Musser Street

Carson City, NV 89701

MOST@carson.org

**Carson City Sheriff Office**

Attn: Deputy Israel Loyola

911 E. Musser Street

Carson City, NV 89701

**Carson City Attorney General**

Attn: Aaron D. Ford

100 N. Carson Street

Carson City. NV 89701

Dated this 26th day of October 2023

Amanda Lee Varon (McClelland)
20 W. College Parkway P364
Carson City, NV 89706
Plaintiff, in Proper Person

24

 Gmail

Amanda Varon <amandalvaron@gmail.com>

## Federal Courts RE: Civil Action

2 messages

**Amanda Varon** <amandalvaron@gmail.com>                                  Thu, Oct 26, 2023 at 3:18 PM
To: jcartsens@dcfs.nv.gov

Jessica,

Please see attached.

You will separately receive a Summons and other supporting documents filed in the Bruce R. Thompson Federal
Courthouse within the next week or so from the Carson City Sheriff's Office.

Sincerely,


Amanda Varon
Formerly Known as
Amanda McClelland

    📄 **DCFS Civil Action 10-26-23 .pdf**
      617K

---

**Mail Delivery Subsystem** <mailer-daemon@googlemail.com>                  Thu, Oct 26, 2023 at 3:18 PM
To: amandalvaron@gmail.com



## Message blocked

Your message to **jcartsens@dcfs.nv.gov** has been blocked.
See technical details below for more information.


The response from the remote server was:

```
550 permanent failure for one or more recipients (jcartsens@dcfs.nv.gov:550 5.4.1 Recipient
address rejected: Access denied. AS(201806281) [BL0GCC02FT015.eop-gcc02.pro...])
```


Final-Recipient: rfc822; jcartsens@dcfs.nv.gov
Action: failed
Status: 4.4.2
Remote-MTA: dns; d247762a.ess.barracudanetworks.com. (209.222.82.255, the
 server for the domain dcfs.nv.gov.)
Diagnostic-Code: smtp; 550 permanent failure for one or more recipients (jcartsens@dcfs.nv.gov:550 5.4.1 Recipient

address rejected: Access denied. AS(201806281) [BL0GCC02FT015.eop-gcc02.pro...)
Last-Attempt-Date: Thu, 26 Oct 2023 15:18:39 -0700 (PDT)


---------- Forwarded message ----------
From: Amanda Varon <amandalvaron@gmail.com>
To: jcartsens@dcfs.nv.gov
Cc:
Bcc:
Date: Thu, 26 Oct 2023 15:18:15 -0700
Subject: Federal Courts RE: Civil Action
----- Message truncated -----

# M Gmail

**Amanda Varon <amandalvaron@gmail.com>**

---

## Federal Courts RE: Civil Action
2 messages

---

**Amanda Varon** <amandalvaron@gmail.com>                    Thu, Oct 26, 2023 at 3:34 PM
To: jpresswood@dcfs.nv.gov

Jhoanna,

Please see attached.

You will separately receive a Summons and other supporting documents filed in the Bruce R. Thompson Federal
Courthouse within the next week or so from the Carson City Sheriff's Office.

Sincerely,


Amanda Varon
Formerly Known as
Amanda McClelland

📄 **DCFS Civil Action 10-26-23 .pdf**
617K

---

**Mail Delivery Subsystem** <mailer-daemon@googlemail.com>          Thu, Oct 26, 2023 at 3:34 PM
To: amandalvaron@gmail.com




## Message blocked

Your message to **jpresswood@dcfs.nv.gov** has been blocked.
See technical details below for more information.


The response from the remote server was:

```
550 permanent failure for one or more recipients (jpresswood@dcfs.nv.gov:550 5.4.1 Recipient
address rejected: Access denied. AS(201806281) [BL0GCC02FT007.eop-gcc02.pr...)
```


Final-Recipient: rfc822; jpresswood@dcfs.nv.gov
Action: failed
Status: 4.4.2
Remote-MTA: dns; d247762a.ess.barracudanetworks.com. (209.222.82.255, the
server for the domain dcfs.nv.gov.)
Diagnostic-Code: smtp; 550 permanent failure for one or more recipients (jpresswood@dcfs.nv.gov:550 5.4.1 Recipient

address rejected: Access denied. AS(201806281) [BL0GCC02FT007.eop-gcc02.pr...)
Last-Attempt-Date: Thu, 26 Oct 2023 15:34:49 -0700 (PDT)


--------- Forwarded message ---------
From: Amanda Varon <amandalvaron@gmail.com>
To: jpresswood@dcfs.nv.gov
Cc:
Bcc:
Date: Thu, 26 Oct 2023 15:34:29 -0700
Subject: Federal Courts RE: Civil Action
----- Message truncated -----

 Gmail

**Amanda Varon <amandalvaron@gmail.com>**

---

## Federal Courts RE: Civil Action
2 messages

**Amanda Varon** <amandalvaron@gmail.com>                                    Thu, Oct 26, 2023 at 3:35 PM
To: mblanchette@dcfs.nv.gov

    Molly,

    Please see attached.

    You will separately receive a Summons and other supporting documents filed in the Bruce R. Thompson Federal
    Courthouse within the next week or so from the Carson City Sheriff's Office.

    Sincerely,


    Amanda Varon
    Formerly Known as
    Amanda McClelland

     **DCFS Civil Action 10-26-23 .pdf**
    617K

---

**Mail Delivery Subsystem** <mailer-daemon@googlemail.com>                    Thu, Oct 26, 2023 at 3:35 PM
To: amandalvaron@gmail.com


     **Message blocked**

    Your message to **mblanchette@dcfs.nv.gov** has been blocked.
    See technical details below for more information.



The response from the remote server was:

550 permanent failure for one or more recipients (mblanchette@dcfs.nv.gov:550 5.4.1 Recipient
address rejected: Access denied. AS(201806281) [DM3GCC02FT021.eop-gcc02.p...])



Final-Recipient: rfc822; mblanchette@dcfs.nv.gov
Action: failed
Status: 4.4.2
Remote-MTA: dns; d247762a.ess.barracudanetworks.com. (209.222.82.255, the
 server for the domain dcfs.nv.gov.)
Diagnostic-Code: smtp; 550 permanent failure for one or more recipients (mblanchette@dcfs.nv.gov:550 5.4.1 Recipient

address rejected: Access denied. AS(201806281) [DM3GCC02FT021.eop-gcc02.p...)
Last-Attempt-Date: Thu, 26 Oct 2023 15:35:49 -0700 (PDT)


---------- Forwarded message ----------
From: Amanda Varon <amandalvaron@gmail.com>
To: mblanchette@dcfs.nv.gov
Cc:
Bcc:
Date: Thu, 26 Oct 2023 15:35:27 -0700
Subject: Federal Courts RE: Civil Action
----- Message truncated -----

 Gmail

**Amanda Varon <amandalvaron@gmail.com>**

---

**Federal Courts RE: Civil Action**
1 message

**Amanda Varon** <amandalvaron@gmail.com>                                    Thu, Oct 26, 2023 at 3:19 PM
To: shelby.riley@dcfs.nv.gov

Shelby,

Please see attached.

You will separately receive a Summons and other supporting documents filed in the Bruce R. Thompson Federal
Courthouse within the next week or so from the Carson City Sheriff's Office.

Sincerely,


Amanda Varon
Formerly Known as
Amanda McClelland

    📎 **DCFS Civil Action 10-26-23 .pdf**
       617K

 Gmail

**Amanda Varon <amandalvaron@gmail.com>**

---

## Federal Courts RE: Civil Action
1 message

**Amanda Varon <amandalvaron@gmail.com>**                    Thu, Oct 26, 2023 at 3:36 PM
To: BOkuma@carson.org

Buffy,

Please see attached.

You will separately receive a Summons and other supporting documents filed in the Bruce R. Thompson Federal Courthouse within the next week or so from the Carson City Sheriff's Office.

Sincerely,


Amanda Varon
Formerly Known as
Amanda McClelland

**DCFS Civil Action 10-26-23 .pdf**
617K

 Gmail

**Amanda Varon <amandalvaron@gmail.com>**

## [Mimecast] Email Delivery Failure
1 message

**Email Security Gateway** <quarantine-donotreply@carson.org>     Thu, Oct 26, 2023 at 3:42 PM
To: Amanda Varon <amandalvaron@gmail.com>

This is a delivery failure notification message indicating that
an email you addressed to email address :
-- bokuma@carson.org

could not be delivered. The problem appears to be :
-- Recipient email server rejected the message

Additional information follows :
-- 5.4.14 Hop count exceeded - possible mail loop ATTR34 [BL0GCC02FT030.eop-gcc02.prod.protection.outlook.com
2023-10-26T22:41:47.811Z 08DBD5F4616F0B32]

This condition occurred after 1 attempt(s) to deliver over
a period of 0 hour(s).

If you sent the email to multiple recipients, you will receive one
of these messages for each one which failed delivery,  otherwise
they have been sent.

 **Gmail**                                        **Amanda Varon <amandalvaron@gmail.com>**

## Federal Courts RE: Civil Action
1 message

**Amanda Varon** <amandalvaron@gmail.com>                          Thu, Oct 26, 2023 at 3:37 PM
To: "jcahill@childfamilymh.com" <jcahill@childfamilymh.com>

Dr. Janet Cahill,

Please see attached.

You will separately receive a Summons and other supporting documents filed in the Bruce R. Thompson Federal Courthouse within the next week or so from the Carson City Sheriff's Office.

Sincerely,


Amanda Varon
Formerly Known as
Amanda McClelland

📎 **DCFS Civil Action 10-26-23 .pdf**
    617K

 Gmail

**Amanda Varon <amandalvaron@gmail.com>**

---

**Federal Courts RE: Civil Action**
1 message

**Amanda Varon** <amandalvaron@gmail.com>                         Thu, Oct 26, 2023 at 3:39 PM
To: Jennifer Jonte <jjonte@dcfs.nv.gov>

Jennifer,

Please see attached.

You will separately receive Summons and other supporting documents filed in the Bruce R. Thompson Federal
Courthouse within the next week or so from the local Sheriff's Office.

Sincerely,


Amanda Varon
Formerly Known as
Amanda McClelland

 **DCFS Civil Action 10-26-23 .pdf**
617K

 Gmail

**Amanda Varon <amandalvaron@gmail.com>**

**Federal Courts RE: Civil Action**
1 message

**Amanda Varon** <amandalvaron@gmail.com>                    Thu, Oct 26, 2023 at 3:41 PM
To: savillo@ag.nv.gov

Stephen,

Please see attached.

You will separately receive Summons and other supporting documents filed in the Bruce R. Thompson Federal
Courthouse within the next week or so served onto your office by the Washoe County Sheriff's Office.

Sincerely,


Amanda Varon
Formerly Known as
Amanda McClelland

📑 **DCFS Civil Action 10-26-23 .pdf**
      617K

 Gmail

**Amanda Varon <amandalvaron@gmail.com>**

## Federal Courts RE: Civil Action
1 message

**Amanda Varon** <amandalvaron@gmail.com>                                  Thu, Oct 26, 2023 at 3:38 PM
To: "melaniemccormickcasa@outlook.com" <melaniemccormickcasa@outlook.com>

Melanie,

Please see attached.

You will separately receive a Summons and other supporting documents filed in the Bruce R. Thompson Federal
Courthouse within the next week or so from the Carson City Sheriff's Office.

Sincerely,


Amanda Varon
Formerly Known as
Amanda McClelland

📎 **DCFS Civil Action 10-26-23 .pdf**
   617K

 Gmail                                        **Amanda Varon <amandalvaron@gmail.com>**

---

## Federal Courts RE: Civil Action
1 message

**Amanda Varon** <amandalvaron@gmail.com>                    Thu, Oct 26, 2023 at 3:40 PM
To: MOST@carson.org

Bekah,

Please see attached.

You will separately receive Summons and other supporting documents filed in the Bruce R. Thompson Federal
Courthouse within the next week or so.

Sincerely,


Amanda Varon
Formerly Known as
Amanda McClelland


📎 **DCFS Civil Action 10-26-23 .pdf**
617K

 Gmail

**Amanda Varon <amandalvaron@gmail.com>**

---

## Federal Courts RE: Civil Action
1 message

**Amanda Varon <amandalvaron@gmail.com>**                    Thu, Oct 26, 2023 at 3:42 PM
To: KAY ARMSTRONG <lapswimmer1956@gmail.com>

Kay,

Please see attached.

You will separately receive Summons and other supporting documents filed in the Bruce R. Thompson Federal Courthouse within the next week or so by the Carson City Sheriff's Office.

Sincerely,


Amanda Varon
Formerly Known as
Amanda McClelland

📄 **DCFS Civil Action 10-26-23 .pdf**
617K